IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Fort Myers Division

FILED
2018 JAN 26 PM 2:32
CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

NAFL INVESTMENTS, LTD.,

    Plaintiff,

v.   Case No: 2:18-cv-63-FtM-99MRM

VAN NESS FELDMAN LLP,

    Defendant.

_____/

### COMPLAINT FOR LEGAL MALPRACTICE AND DEMAND FOR JURY TRIAL

NAFL Investments, Ltd. ("Plaintiff") sues Van Ness Feldman LLP ("Defendant") and, in support, states as follows:

### Nature of the Action

1. This legal malpractice action arises out of Defendant's legal advice and representation of Plaintiff in a real estate project and related litigation. Defendant promised a heightened-level of professional services and owed fiduciary duties of care and loyalty to Plaintiff. Defendant breached those duties and caused reasonably foreseeable damages.

2. The damages were caused by the drafting negligence of Defendant in connection with Plaintiff's stated goal of managing risk by structuring a non-recourse project and compounded by its negligent, failure to discover (or due to its conflict willfully or recklessly failed to disclose) that negligence over the many years it continuously represented Plaintiff.

3. Plaintiff independently discovered Defendant's negligence in 2017 and, accordingly, now files this action.

4. All conditions precedent to the maintenance of this action have been satisfied, waived, or excused.

## Jurisdiction and Venue

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy is in excess of $75,000.

6. Venue is proper under 28 U.S.C. § 1391(2) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this district.

## Parties

7. Plaintiff is a Florida limited partnership with its principal place of business in Naples, Collier County, Florida.

8. Defendant is a limited liability partnership engaged in the practice of law in this district with its principal place of business and state of incorporation in Washington, D.C.

9. Plaintiff hired Defendant as its attorneys in 1985 in connection with a very long-term project regarding land in Collier County, Florida. The representation continues to this date.

## General Allegations

10. In 1985, the U.S. Department of the Interior (the "Government") approached Plaintiff in Naples, Florida to discuss acquiring real estate in Florida (the "Florida Land") owned by Plaintiff. The Government lacked a budget appropriation so it proposed paying for the Florida Land by trading land in Arizona (the "Arizona Land") accompanied by long-term Government (owner) financing for any valuation differential.

11. Plaintiff had not sought this project, but agreed to explore it.

12. Plaintiff hired Defendant based on its representation that it would provide the <u>highest quality</u> professional services that would be tailored to the needs and resources of Plaintiff.

2

Defendant touted its services to the government, including the United States Senate, the United States House of Representatives and various departments and agencies of the Executive Branch of the Federal government.

13. Defendant was founded in 1977. It holds itself out as having represented clients in land exchanges for more than 40 years:

> Since its founding, Van Ness Feldman has assisted clients in the energy, mining, resource and real estate development .... with the U.S. government relating to use of and access to federal lands. ... The firm has facilitated a number of major land exchanges and transfers on behalf of our clients ...
>
> ***
>
> Having been engaged in the practice of land and water resources law for over thirty years, Van Ness Feldman has extensive experience in representing private and other non-federal landowners in federal land exchange transactions.
>
> Land exchanges, where the federal government "trades" or "swaps" public lands with corporations, individuals, states, or local governments, can be a valuable tool for landowners. They enable landowners to acquire lands with greater development or economic potential—for commercial, industrials, residential, and/or agricultural purposes—in return for lands that have less development or economic potential but that may offer public recreation, wildlife, or resource values warranting public acquisition. Land exchanges also are an important component of the federal government's land management strategy, enabling federal agencies to improve resource management by consolidating federal land ownership, and to obtain property needed to protect endangered species, promote biological diversity, increase recreational opportunities, and/or preserve cultural resources.
>
> ***
>
> *Van Ness Feldman's nationally recognized real estate and land use attorneys* and land use planners forge innovative, reasoned solutions to facilitate development that is compatible with public policy and community values. *This unique collaboration demands not only a deep understanding of the law but of the highly nuanced practice, political and public relations aspects of complex, large-scale land use and development projects.*

> The firm's experience extends from *acquisition, development and finance*, negotiation of commercial leases, *management of large due diligence evaluations, structuring of multi-property acquisitions*, regulatory analysis, compliance, and mitigation, to permit acquisition, expedition, defense and appeals.

vnf.com (1/10/18) (emphasis supplied).

14. Since Plaintiff would be trading the known (Florida Land) for the unknown and yet to be developed land (Arizona Land) in what promised to be a very long-term project, Plaintiff sought to manage its risk by limiting its downside losses and it insisted on the entire project being non-recourse so that it could end its obligations at any time, for any or no reason, and simply walk away.

15. Defendant advised Plaintiff that the documentation Defendant drafted (collectively the "Transfer Documents") did, in fact, give Plaintiff the unfettered right to unilaterally cease making payments and walk away at any time and for any or no reason with no obligation other than the transfer of ownership rights in any remaining collateral (i.e., "non-recourse").

16. In reliance on that advice, Plaintiff agreed to the 30-year exchange project and Defendant drafted the Transfer Documents, including the Trust Fund Payment Agreement, Promissory Note (Nonrecourse) and Deed of Trust.

17. The non-recourse nature of the project was material to Plaintiff. Defendant represented, and Plaintiff understood, that the Transfer Documents allowed Plaintiff to exercise its right to exit the project at any time and for any reason, with no recourse. In 2017, Plaintiff discovered that advice was wrong.

18. As is customary in real estate development projects, Plaintiff sought the right (also documented by Defendant in the Transfer Documents) to obtain a partial release of lien at any time if the value of the collateral *at the time of release* was equal to not less than 130% of the amount

4

of the debt. Instead of drafting documents that limited this release valuation inquiry to the closing date of any release of lien transaction, however, Defendant carelessly drafted a maintenance of collateral term (the "Collateral Term") that, without Plaintiff's knowledge, obligated Plaintiff to ensure that the value of the collateral securing the indebtedness would *forever equal or exceed 130% of the amount of debt after a partial release,* in essence, eliminating the all-important non-recourse provision.

19.     In addition, the Transfer Documents gave the Government the right to specifically enforce the Collateral Term without having to foreclose or seek damages for nonpayment of the note. Thus, although the note was labeled "non-recourse," the Transfer Documents prepared by Defendant failed to satisfy the non-recourse condition and exposed Plaintiff to even greater financial risk than if the project had been full recourse.

20.     Following a severe recession, interest rates plummeted to near 0%, while Plaintiff continued to make payments of interest at the rate of 8.5%. Since the Transfer Documents prohibited refinancing at a lower interest rate or simply paying off the debt, Plaintiff had no way to reduce its risk or limit its losses other than to exercise its right to walk away from the project.

21.     Accordingly, with the help and advice of Defendant, Plaintiff notified the Government that it deemed itself released from all obligations under the Transfer Documents, including any obligation to make payments under the note, as it was exercising its right to walk away without recourse as Defendant had continually advised it was permitted to do.

22.     In response, the Government notified Plaintiff's lawyers that it disagreed. While agreeing that the *note* was non-recourse, it asserted "that the documents allow a claim for specific performance [of the Collateral Terms] because [Plaintiff] took advantage of the release provisions for certain parcels and promised additional security in return." Apparently, Defendant had completely missed (or failed to disclose) the fact that the Transfer Documents were written such

5

that as soon as Plaintiff obtained one partial release, Plaintiff automatically lost the essence of its bargain, *i.e.*, the non-recourse provision allowing it to walk away from any further obligations to the Government.

23. In turn, Defendant, rather than admit its drafting error (Defendant was conflicted and apparently unwilling to take responsibility for its mistake) continued to advise Plaintiff that the position taken by the Government was wrong, that the Transfer Documents were unambiguous, and that Plaintiff could indeed walk away without paying additional dollars or furnishing additional collateral. Further, Defendant advised Plaintiff that it should not settle with the Government, but should instead defend the threatened legal action. Defendant reconfirmed Plaintiff's understanding of the Transfer Documents that Defendant drafted and approved and advised they would be enforced by the court and that, moreover, the Government would be ordered by the court to pay Plaintiff's legal fees and costs.

24. As expected, the Government filed suit in early 2014 in Arizona. At that point, Plaintiff hired a law firm in Phoenix to assist in its defense, but continued to be advised by Defendant, unaware of Defendant's negligence and conflicts of interest.

25. Long before the Government's suit, there were clear opportunities for Defendant to disclose and remedy its Collateral Term error and to mitigate its damages. For example, in 1998, the first of two partial releases was sought by Plaintiff. At that time, Defendant knew or should have known of its drafting error, yet failed to disclose or correct it and therefor did not (and could not, absent such disclosure) properly advise Plaintiff of the risk in relying on Defendant's advice regarding the Collateral Term subsequent to the exercise of partial release rights.

26. In 2007, a second partial release was requested. Once again, Defendant continued to represent Plaintiff, yet its Collateral Term drafting error remained undisclosed and uncorrected, and no effort was made to mitigate its damages.

6

27. Thus, without Plaintiff's knowledge, and while Defendant remained silent, the partial releases triggered a perpetual obligation to maintain collateral far in excess of the value of the debt, thus in effect converting the project to full recourse even though the note itself remained non-recourse.

28. Another opportunity for Defendant to mitigate the damages caused by its negligence and nondisclosures arose in 2015 during Plaintiff's settlement mediation with the Government. Once again, instead of disclosing and advising that the Collateral Term would likely cause Plaintiff to lose because it did not mean what it had told Plaintiff it meant, Defendant continued to advise Plaintiff not to pay what the Government then indicated it would accept to settle.

29. In early 2016, the district court in Arizona ruled on cross motions for summary judgment and agreed with the Government. After entry of the ensuing final judgment, Defendant advised Plaintiff to appeal the judge's opinion and, once again, failed to disclose its erroneous draftsmanship, its foreseeable consequences or Defendant's conflicts. Instead, it insisted that the district court was wrong and that Plaintiff would likely succeed on appeal.

30. Again (and still) following Defendant's advice, Plaintiff agreed to appeal and hired an appellate law firm in Washington, D.C. for that purpose. As the litigation risk caused by Defendant's careless drafting of the Collateral Term became clear, settlement became the only viable option. As a result, and with Defendant's approval, the case was settled at essentially full value in favor of the Government in August 2017.

31. Plaintiff never knowingly agreed to a deal with the Government that was anything except non-recourse, allowing it to manage the risk associated with a 30-year time horizon that included a promissory note that could not be prepaid, and including the right to walk away at any

time. As a result of Defendant's continuous advice, counsel, conflicts and willful or reckless failure to disclose material facts over more than 20 years, however, Defendant caused that result.

## Count
## For Legal Malpractice

32. Plaintiff incorporates by reference the allegations of paragraphs 1 through 31 as if fully set forth herein.

33. Defendant was and is a law firm that engages in the practice of law.

34. Defendant acted as Plaintiff's counsel as set forth above.

35. At all times, Defendant owed a fiduciary duty of care and loyalty to Plaintiff.

36. At all times, Defendant promised to provide the highest quality legal services in evaluating, structuring, managing risk and effectuating the project set forth above.

37. Defendant breached both its fiduciary duties and heightened level of professional care by, among other things, (1) structuring and drafting documents and continuing to advise on the project in a way that failed to provide non-recourse protection for Plaintiff; (2) willfully or recklessly failing to disclose its drafting error or conflicts to Plaintiff; and (3) furnishing negligent representation and advice in litigation.

38. As a direct and proximate cause of Defendant's numerous breaches, Plaintiff suffered losses and damages in excess of $90 million that it now seeks to recover, including, but not limited to: (a) the value of the Florida Land that it owned and transferred, lost profits and related damages; (b) the settlement payment to the Government and all related fees, costs and expenses; and (c) pursuant to the Wrongful Act Doctrine, the attorneys' fees, professional fees and other costs and expenses incurred in the underlying litigation.

WHEREFORE, Plaintiff, NAFL INVESTMENTS, LTD., demands judgment in its favor and against Defendant, VAN NESS FELDMAN LLP, for compensatory damages, punitive

damages, prejudgment interest, costs, and all such other or additional relief as this Court may deem appropriate.

## Demand for Jury Trial

Plaintiff hereby demands a trial by jury for all causes of action.

DATED: January 25, 2018.

Respectfully submitted,

*[signature]*

Scott J. Link
Florida Bar No. 602991
Kara Berard Rockenbach
Florida Bar No. 44903
LINK & ROCKENBACH, PA
1555 Palm Beach Lakes Boulevard, Suite 301
West Palm Beach, Florida 33401
Tel: 561-727-3600; Fax: 561-727-3601
Email: Scott@linkrocklaw.com
Email: Kara@linkrocklaw.com
Secondary: Tina@linkrocklaw.com
Secondary: Eservice@linkrocklaw.com

- AND -

Thomas R. Grady
Florida Bar No. 350702
GRADYLAW
720 Fifth Avenue South, Suite 200
Naples, Florida 34102
Tel: 239-261-6555
Email: trgrady@gradylaw.com

*Plaintiff's Trial Counsel*